UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Ami Rice,<br><br>    *Plaintiff*,<br><br>v.<br><br>Frank Bisignano,<br>Commissioner of Social Security,<br><br>    *Defendant*. | No. 25 CV 1014<br><br>Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

    Aimi Rice asserts she has been unable to work since February 1, 2020 due to chronic pain stemming from her trigeminal neuralgia and migraines with auras, as well as her anxiety and depression. [Dkt. 11-3 at 46, 49.] Rice first applied for social security benefits in February 2021. [Dkt. 11-1 at 22.] The Administrative Law Judge found her conditions limiting but not disabling, and after unsuccessfully appealing the decision, Rice filed a complaint in federal court. [*Id.* at 38.] By agreement of the parties, the district court remanded the claim to the Appeals Council, dkt. 11-3 at 132, who remanded to the same ALJ to more fully evaluate the medical opinions, the Residual Functional Capacity (RFC) assessment, and Rice's subjective symptoms, *id.* at 150–53. The ALJ issued a modified decision again denying Rice benefits on October 23, 2024. [*Id.* at 43–65.]

    Rice now requests judicial review of the 2024 disability determination. Because the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion that Rice would never experience time-off task or absences on account of her migraines, the court cannot meaningfully review his decision, and so the matter is remanded for further proceedings consistent with this opinion.

## I.   Background

### A.   The Record

    In 2016, Rice developed right-sided trigeminal neuralgia. [Dkt. 11-3 at 50.] In an effort to address pain from the condition, she underwent microvascular decompression surgery and Gamma Knife radiosurgery. [*Id.*] Three years later she

was still experiencing pain from trigeminal neuralgia and chronic migraines so she met with a neurologist, Dr. Eva Pilcher.[1]

Rice tried numerous oral preventative medications to address her migraines, but each was unsuccessful, so Dr. Pilcher prescribed Aimovig injections and later began Botox injections. [Dkts. 11-1 at 401, 405; 11-3 at 17.] The Botox injections greatly help the severity of Rice's migraines but do not reduce the frequency or duration. [Dkt. 11-3 at 6.] In 2022, Dr. Pilcher opined that Rice suffered from around ten to twelve headaches per month that would require frequent daily breaks to lay down in a dark room and would miss more than four days of work per month. [Dkt. 11-2 at 356.][2] Rice testified that she continues to suffer from severe migraines and trigeminal neuralgia flares around thirteen days per month. [Dkt. 11-3 at 80.] The flares, she said, require her to retreat to a dark, quiet room and use medications that render her unable to function. [*Id.* at 81; 11-1 at 52–53.]

Rice also suffers from anxiety and depression that worsens with her chronic pain. In 2020, she had weekly therapy sessions with psychologist, Dr. James McTague. [Dkt. 11-2 at 160.] He opined that Rice would have marked limitations in functioning due to pain and mental impairments. [*Id.* at 346–47.]

In addition to these specialists, Rice frequently saw primary care providers at Family Medicine. In 2022 Molly Iverson, A.P.N. opined that Rice's mental impairments would cause her to miss more than six days of work per month and be off task more than 30% of the workday. [*Id.* at 352–55.] Rice's treatment notes from Family Medicine reveal that she takes medications for depression and anxiety which manage her symptoms. [See, *e.g.*, dkt. 11-4 at 288.] At several visits, Rice also complained of headaches, migraines, and chronic pain from her trigeminal neuralgia. [See, *e.g.*, dkt. 11-1 at 500.] More recent notes (May and July 2024) from Family Medicine indicate that Rice reported "good symptom control with improved functioning from baseline." [Dkt. 11-4 at 273, 276.]

The record also includes several agency consultative medical opinions. Two medical consultants and two psychological consultants authored reports in 2021, finding mild to moderate limitations in Rice's physical and mental functioning. [Dkt. 11-1 at 78–98.] Their review was limited, however, as they did not have access to Rice's complete medical records. In 2024, several additional medical and psychological consultants reviewed the record or examined Rice, again finding mild to moderate limitations. [Dkts. 11-3 at 135, 139, 141, 143, 146; 11-4 at 132–33.] It is unclear if any of these consultants had access to the full record, as none appear to reference Dr. Pilcher's treatment notes.

---

[1] Rice testified that her migraines and trigeminal neuralgia "play off each other" so she doesn't "have [trigeminal neuralgia] pain without migraine pain" or "migraine pain without [trigeminal neuralgia] pain." [Dkt. 11-1 at 53.]

[2] The record, at times, seems to use headache and migraine interchangeably.

2

B.  **ALJ Decision**

Applying the five-step process set forth in 20 C.F.R. § 416.920(a)(4), the ALJ determined that Rice was not disabled within the meaning of the Social Security Act, 42 U.S.C. § 1382c(a)(3). At steps one and two of the analysis, the ALJ determined that Rice had not engaged in substantial gainful activity since she applied for benefits and that she had severe impairments— trigeminal neuralgia; migraine headache; depression; and anxiety—that significantly limited her ability to perform basic work activities. [Dkt. 11-3 at 49.] At step three, the ALJ found that Rice did not have an impairment that met or equaled any impairment listed in the regulations as being so severe as to preclude substantial gainful activity. [*Id.* at 50.]

Before moving to step four, the ALJ crafted the following RFC for Rice:

> lift and/or carry up to 20 pounds occasionally and 10 pounds frequently, and has no limitations in her ability to sit, stand or walk throughout an 8-hour workday. She ought not work where she would be exposed to concentrated loud noises or bright, flashing lights which exceed levels generally encountered in office-type environments. The claimant is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights, and she should avoid concentrated exposure to unguarded hazardous machinery. The claimant can understand, remember, and carry out simple instructions. The claimant can use judgment to make simple work-related decisions. The claimant can tolerate occasional interactions with supervisors and coworkers. The claimant can tolerate no interactions with the general public. The claimant cannot perform work requiring a specific production rate such as assembly line work. The claimant can deal with occasional changes in a routine work setting.

[*Id.* at 55.] The ALJ assessed Dr. McTague's report as minimally persuasive, considered and rejected portions of Dr. Pilcher's report, found A.P.N. Mallory Iverson's report unpersuasive, and deemed various agency consultative examiner opinions partially persuasive. [*Id.* at 60–64.] At steps four and five of the analysis, the ALJ relied on a vocational expert's testimony from Rice's 2022 hearing to conclude that Rice was capable of performing jobs that exist in significant numbers in the national economy and thus not disabled. [*Id.* at 64–65.]

II. **Legal Standard**

In reviewing an ALJ's disability determination, courts "proceed[] with a light touch—not holding ALJs to an overly demanding evidentiary standard and in turn reinforcing that claimants bear the affirmative burden of proving their disability." *Thorlton v. King*, 127 F.4th 1078, 1080 (7th Cir. 2025). The court must affirm an ALJ's decision if it is supported by substantial evidence—"such relevant evidence as

3

a reasonable mind might accept as adequate to support a conclusion." *Moy v. Bisignano*, 142 F.4th 546, 552 (7th Cir. 2025) (internal citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014).

To allow for meaningful review, the ALJ is also subject to minimal articulation requirements. See *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024). That is, the ALJ must "build an accurate and logical bridge from the evidence to his conclusion," assuring the reviewing court that he "considered the important evidence and applied sound reasoning to it." *Moy*, 142 F.4th at 552 (internal citation omitted).

## III. Analysis

Rice asserts that the ALJ erred for several reasons, including failing to take her subjective symptoms into account and discounting Dr. Pilcher's opinion.[3] She says that the ALJ ignored Dr. Pilcher's determination that Rice would require unscheduled breaks to lie down or sit quietly and inadequately explained his decision to discredit Rice's testimony regarding the severity and frequency of her migraines. [Dkt. 18 at 9, 11–13.] Had the ALJ properly assessed these two pieces of evidence, Rice explains, he would have included a limitation in the RFC that addressed her need to lie down in a quiet, dark room several times per month. [*Id.* at 12–13.] And, at the very least, she continues, the ALJ needed to explain why he did not include such a limitation. [*Id.* at 13.]

Dr. Pilcher opined that Rice suffers from headaches that last anywhere between one and four days around ten to twelve times per month. [Dkt. 11-2 at 265.] Lack of sleep, bright lights, menstruation, hunger, loud sounds, stress, vigorous exercise, and weather changes, Dr. Pilcher observed, trigger Rice's headaches, and her headaches can be improved by lying in a dark room, medication, and Botox. [*Id.*] She concluded that, during a typical eight-hour workday, Rice would need breaks of about one hour, one to two times per week where she needs to lay down and sit quietly. [*Id.* at 357.] In Dr. Pilcher's opinion, Rice is incapable of even low stress jobs and could not perform even basic work activities while experiencing a headache. [*Id.* at 357.] While Rice's migraines come with "good days" and "bad days," Dr. Pilcher stated that Rice would likely miss more than four days of work per month because of her headaches. [*Id.* at 357–58.]

Rice's testimony at her hearings was similar. At her May 2022 hearing before the ALJ, Rice testified that she suffers severe pain from her trigeminal neuralgia and migraines, which always flare together, around ten days a month on average. [Dkt.

---

[3] Rice frames her argument around the ALJ's alleged failure to abide by the remand order. But an ALJ's failure to abide by a remand order does not provide independent grounds for reversal. See *Rabdeau v. Bisignano*, 155 F.4th 908, 912–13 (7th Cir. 2025).

11-1 at 52.] On those days, she said that she is "nonfuctional" and usually just lays in a dark room. [*Id.*] Medication, she explained, can reduce her pain, but also leaves her unable to function due to side effects. [*Id.* at 52–53.] Rice testified that she recently began Botox injections for her migraine pain, which helped with the intensity but did not reduce the frequency or duration. [*Id.* at 54.]

At her hearing in September 2023, Rice explained that she was still receiving Botox injections every 90 days that continue to help with the intensity of her migraine pain but do not stop the number of flares or elevated pain days. [Dkt. 11-3 at 79–80.] She said that she still experiences around fifteen headache days per month, particularly around her menstrual period, during the three to four days where her Botox cycle is wearing off, and for a few days while she is waiting for the Botox injections to "kick in." [*Id.* at 80.] In addition to those more predictable flares, Rice continued, she still experiences "weather pain days" and "just-because pain days." [*Id.*] Of the fifteen headaches per month, she testified that thirteen cause severe pain leaving her unable to function. [*Id.* at 81.] On those days, Rice remarked, she does not leave the house and would need someone to drive her to doctor appointments that she could not otherwise reschedule. [*Id.* at 81–82.] She instead retreats to a dark, quiet space and takes a marijuana edible. [*Id.* at 82.] And if that's not enough to bring her pain to a manageable level, Rice explained, she would then take several oral prescription medications. [*Id.*]

In short, both Dr. Pilcher's opinion and Rice's testimony suggest that Rice would not be consistently on task for an entire eight-hour workday. Yet the ALJ made no mention of such a limitation and did not include one in Rice's RFC.

Considering that the ALJ no doubt found that Rice did indeed suffer from migraines—i.e., he found them to be a severe impairment and included some limitations to address the migraines, such as no concentrated exposure to bright lights or loud noise—that lack of discussion is troubling. *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014) ("Specifically, the ALJ should have at least included in the RFC determination the likelihood of missing work. The ALJ's decision did not reflect any likelihood of absences or breaks at work related to migraines, and that is simply unsupported by the record."); *Dorian W. v. Kijakazi*, 2023 WL 6311697, at *7 (N.D. Ill. Sept. 28, 2023) ("[T]he possibility of Plaintiff's chronic absenteeism was squarely before the ALJ; even if the ALJ did not credit the likelihood of Plaintiff's absenteeism, she still [m]ust explain her reasoning, building a so-called logical bridge that connects the evidence and her decision." (internal citations omitted)); *Gould v. Kijakazi*, 2022 WL 541511, at *3 (E.D. Wis. Feb. 23, 2022) ("If a claimant suffers migraines that are severe enough to force her to miss work, just two migraines a month could be disabling. For this reason, it is generally important for an ALJ to include an absenteeism rate when determining the RFC of a claimant who suffers from migraines." (cleaned up)). The ALJ, moreover, fails to build a logical bridge between the evidence and his decision to discredit both Dr. Pilcher's opinion and Rice's

5

testimony, both of which support the conclusion that Rice would experience time-off task on account of her migraines.

While he does not say so directly, the ALJ appears to have entirely rejected Dr. Pilcher's opinion regarding the severity and frequency of Rice's migraines. In doing so, he observed that: (1) the Botox injections "helped greatly," (2) Rice told Mallory Iverson, APN, a month earlier that her symptoms were managed on her current medication regimen, (3) Dr. Pilcher relied on Rice's subjective report of symptoms, and (4) Rice missed no medical appointments and no medical personnel observed her on a day of extreme pain. While the ALJ certainly had a right to consider each of these factors, his explanation falls short of supporting his conclusion that Dr. Pilcher's opinion that Rice would need breaks during an eight-hour workday was incredible.

First, while both medical records and Rice's own testimony indicate the Botox injections relieved some of Rice's migraine pain, those same sources of evidence consistently report that the migraines were still debilitating and occurring frequently. *Cf. Latesha K. v. Kijakazi*, 2021 WL 3209644, at *5 (N.D. Ill. July 29, 2021) ("[T]he ALJ's insistence that Latesha's migraines had a 'good response' to medication rests on a cherry-picked version of the evidence. The ALJ failed to address records showing that Latesha's headaches persisted despite medication.") Nothing about Botox injections improving Rice's symptoms is inconsistent with her experiencing headaches or migraines ten to twelve times per month. Indeed, both Rice's testimony and medical records show continuing complaints of debilitating migraines since she began treatment, including during periods where the Botox begins to wear off. [See, *e.g.*, 11-4 at 407 (Dr. Pilcher's notes describing Rice's condition as "chronic, refractory debilitating migraines"); dkt. 11-1 at 459 (Family Medicine notes reporting Rice's complaints of "severe headaches"); *Id.* at 439 (Rice told Family Medicine provider that pain is "often severe, impacting daily activities); dkt. 11-3 at 80 (Rice's testimony explaining that migraine pain is worst when Botox is kicking in or wearing off).] And if the ALJ had any question about what Rice meant when she said that the Botox "helped greatly" or the migraines "worsened" as the Botox wore off, he did not ask for clarification at her disability hearings.

Mallory Iverson's report that Rice "feels" her symptoms "are managed on the current regimen" also lends little support for discounting entirely Dr. Pilcher's opinion. Dr. Pilcher was the physician treating Rice's migraines so it would not be all that unusual for Rice to focus her migraine complaints to Dr. Pilcher, rather than to Iverson at an appointment meant to refill prescriptions and review lab results. [Dkt. 11-2 at 200.]

Because Dr. Pilcher's notes indicated that she planned to rely at least in part on a list of symptoms provided to her by Rice in preparing her medical opinion for the disability determination, the ALJ also found her opinion unreliable because it was based more on Rice's subjective report than on objective treatment evidence. First, it

6

is unclear how the ALJ concluded that she relied *more* on Rice's subjective reports than treatment records. In the same treatment notes where she mentions the list of symptoms, Dr. Pilcher indicates that she reviewed Rice's labs and medication. [Dkt. 11-2 at 376.] Dr. Pilcher had also been treating Rice's migraines with various medications and injectables for almost two years by this point. See *Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014) (finding that treating physicians who continue to prescribe drugs indicates they believed complaints of pain); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (finding it improbable that a "host of medical workers would prescribe drugs and other treatment for [a patient] if they thought she were faking her symptoms").

So while it is true that an ALJ is free to give less weight to medical opinions that rely on a claimant's subjective reports, see *Alvarado v. Colvin*, 836 F.3d 744, 748 (7th Cir. 2016), his explanation is insufficient to support his decision to reject Dr. Pilcher's opinion. This is especially so since migraines, as the Seventh Circuit has observed, are often not subject to objective verification. See *Moon*, 763 F.3d at 722.

Lastly, the ALJ briefly mentions that "the record as a whole does not support such severity of migraines that would cause excessive absences." [Dkt. 11-3 at 63.] In support, he points out that no medical personnel observed Rice on an extreme pain day and the record showed no missed medical appointments. It is less than clear how the ALJ reached the conclusion that no medical personnel observed Rice on an extreme pain day. He mentions several times that Rice's treatment notes often indicate that Rice had normal neurological exams. But "[t]here is no single procedure that can confirm the diagnosis of migraines. Indeed, doctors frequently diagnose migraines when the described symptoms are typical, and results of physical and neurological examinations are normal." *Bradberry v. Comm'r of Soc. Sec.*, 2025 WL 545925, at *5 (N.D. Ind. Feb. 18, 2025) (citation omitted). And in any event, several courts have advised against discounting a patient's reports of pain based on their ability to attend medical appointments. See *Rucker v. Kijakazi*, 48 F.4th 86, 93 (2d Cir. 2022) ("As the court stated in *Virden v. Colvin*, 2015 WL 5598810, at *11 (C.D. Ill. Sept. 22, 2015), 'a claimant's regular attendance at medical appointments says very little about her ability to work during her appointments. Indeed, it would seem that a person suffering from [significant impairments] would have a strong interest in attending appointments and seeking relief rather than missing appointments.'").

The ALJ thus did not support his conclusions regarding the severity of Rice's migraines through discounting Dr. Pilcher's opinion.

The ALJ also fails to adequately explain his reasoning behind discrediting Rice's subjective report of her migraine frequency and severity. To be sure, an ALJ has considerable deference when it comes to credibility determinations. See *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) ("We may disturb the ALJ's credibility finding only if it is patently wrong."). But he still must support the

7

conclusion with substantial evidence and adequately explain his reasoning. See *Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020).

In evaluating Rice's subjective report of symptoms, the ALJ observes that no objective evidence supports Rice's testimony about pain intensity, duration, and frequency. In particular, he says that none of the treatment records noted the intensity, frequency, or duration of Rice's migraines. In making this statement, however, the ALJ only references treatment records from Family Medicine and Dr. McTague. [Dkt. 11-3 at 57.][4] In other words, he seemingly ignores the treatment records from the physician treating Rice's migraines, Dr. Pilcher, who, as the ALJ later acknowledges, consistently documented the frequency and severity of the migraines. [*Id.* at 58 (ALJ observing that Dr. Pilcher noted that Rice reported 15 headaches per month).]

Recall also that objective medical evidence is hard to come by for migraines, see *Overton v. Saul*, 802 Fed. Appx. 190, 192 (7th Cir. 2020), and an ALJ cannot discount a claimant's testimony about pain based purely on lack of objective medical evidence, see *Carradine*, 360 F.3d at 753 ("And so once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." (internal citations omitted)).

The Commissioner argues that the ALJ did not err in assessing Dr. Pilcher's opinion because he found several consultative medical opinions that indicated a lower level of limitations partially persuasive and imposed a more restrictive RFC than suggested by those opinions. But two of the consultative physicians, who authored their reports in 2021, did not review Rice's full medical record. Notably, they did not review Dr. Pilcher's treatment notes. The other two opinions the Commissioner points to are psychological consultants who focused on mental impairments related to Rice's anxiety and depression, not her migraines. [Dkt. 23 at 5.]

At bottom, the ALJ accepted, presumably based on the medical records and Rice's testimony, that Rice suffered from severe migraines that could impact her ability to work. He included several limitations in Rice's RFC to address certain triggers of those migraines, such as avoiding concentrated exposure to loud noise and bright lights.

The ALJ did not, however, explain why he failed to include limitations for other aspects of Rice's condition documented in her testimony and medical record. Rice's medical records and testimony, for example, indicated that she experiences migraine flares around her menstrual period and cold weather, and would need a quiet, dark

---

[4] The court also observes that some of these medical records do include information about intensity and frequency, see dkts. 11-1 at 439, 459, 500; 11-3 at 402, 429, and taken together, the records demonstrate that Rice consistently reported suffering from migraines and related pain, see, *e.g.*, dkts. 11-1 at 295, 396, 405; 11-2 at 169, 176; 11-4 at 405–06.

room to lay down in when migraines did occur. Yet the ALJ includes no limitations to address *those* triggers in the RFC.

In no way does the court mean to suggest that the ALJ was prohibited from accepting some medical records and testimony as credible while discounting other evidence. The problem is the ALJ did not build an adequate, logical bridge between the evidence and his decision to accept certain testimony/medical records concerning Rice's migraines while discounting others, so the court cannot say whether his conclusions are supported by substantial evidence. See *Carradine*, 360 F.3d at 756 ("[A]n administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws, even if those flaws might be dissipated by a fuller and more exact engagement with the facts. (cleaned up)).

Because the court finds remand proper based on the ALJ's analysis of the severity and frequency of Rice's migraines, it does not discuss Rice's other arguments for remand.

## IV.   Conclusion

For these reasons, the court remands the case to the agency for further proceedings.

Enter: 25-cv-1014
Date: December 17, 2025

_____
Lindsay C. Jenkins

9